UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
KINGVISION PAY-PER-VIEW CORP.,
LTD.,

                Plaintiff,

-against-

SUGEY JIMENEZ, et al.,

                Defendants.
------------------------------------------------------X

**REPORT AND RECOMMENDATION**

03 CV 2171 (CBA)

      Plaintiff Kingvision Pay-Per-View, Ltd. (hereinafter "Kingvision") filed this action on May 5, 2003, alleging that the defendants El Paisa Restaurant Corp., d/b/a Paisa Cuchifrito, a/k/a El Paisa Cuchifrito ("El Paisa"), and Sugey Jimenez, individually and as an officer, director, and shareholder of El Paisa, engaged in the illegal theft of a closed-circuit telecast of the November 17, 2001 boxing match between Hasim Rahman and Lennox Lewis, in violation of 47 U.S.C. §§ 553(a) and 605. Despite proper service, the defendants failed to appear. Upon plaintiff's application, a default was entered against the defendants on February 25, 2005, and a default judgment was entered on March 4, 2005. The matter was then referred to the undersigned magistrate judge for the purpose of conducting an inquest and to report and recommend the amount of damages to be awarded.

      For the foregoing reasons, this Court respectfully recommends that, pursuant to 47 U.S.C. §§ 605(e)(3)(C)(i)(II), 605(e)(3)(C)(ii), and 605(e)(3)(B)(iii), plaintiff be awarded $7,000.00 in damages for which defendants are jointly and severally liable, plus costs in the amount of $220.00 from defendant Jimenez and $265.00 from El Paisa, plus interest from the date of the

violation until the date the judgment is paid.

## BACKGROUND

Plaintiff Kingvision entered into a closed-circuit television licensing agreement (the "Agreement"), in which plaintiff was granted exclusive rights to televise the November 17, 2001 championship boxing match between Hasim Rahman and Lennox Lewis on closed circuit televisions located in various bars, restaurants, theaters, arenas, and in private homes throughout New York. (Compl. § 12; Pl's. Mem. at 2).[1] In addition, the Agreement gave plaintiff the exclusive right to exhibit all undercard or preliminary bouts prior to the match (collectively, the "Event") at these closed circuit television locations. (Compl. ¶ 12). These closed circuit locations could only obtain access to the broadcast by entering into a contractual relationship with plaintiff, which required each establishment to pay a sublicense fee to Kingvision. (Id. ¶ 13; Pl.'s Mem. at 2).

In order to receive access to the interstate satellite transmission of the Event, each participating establishment was provided with electronic decoding equipment and satellite coordinates necessary to receive the electronically coded or scrambled signal. (Pl's. Mem. at 2). Authorized residential cable subscribers could also obtain transmission of the Event through their residential pay-per-view cable system. (Id.)

Plaintiff alleges that defendant El Paisa is a commercial establishment, located at 126-19 Jamaica Avenue, Richmond Hill, New York, and that defendant Sugey Jimenez is an officer of El Paisa. (Compl. ¶¶ 6–7). On the night of the event, November 17, 2001, an auditor for

---

[1]Citations to "Compl." refer to the Complaint filed in this action on May 5, 2003; citations to "Pl's. Mem." refer to the Plaintiff's Inquest Memorandum, dated March 17, 2005.

plaintiff was present at El Paisa when he observed the Event being intercepted, received, and then televised to patrons of the defendants, without prior authorization. (Pl's. Mem. at 2). According to the auditor's Affidavit, he observed one television set in the premises and approximately 2 patrons on the premises at the time of the broadcast. (Lonstein Aff. at 1–2; Viteritti Aff. at 1).[2]

On May 5, 2003, plaintiff commenced this action, seeking statutory damages pursuant to 47 U.S.C. §§ 553 and 605. Plaintiff served copies of the summons and complaint upon the defendants, pursuant to the Federal Rules of Civil Procedure. When defendants failed to answer or otherwise respond to the complaint, plaintiff moved for entry of default, which was then entered by the district court. By Order dated March 7, 2005, the parties were directed to submit papers with respect to plaintiff's claim for damages. Having received no opposition papers from the defendant, this Court reviewed the plaintiff's submission and reports as follows.

## DISCUSSION

1. Default

Rule 55 sets forth a two-step process in which first a default, and then a default judgment, is entered. See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993). The court clerk automatically enters the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure by noting the party's default on the clerk's record of the case. See id.; Fed. R. Civ. P. 55(a)

---

[2]Citations to "Lonstein Aff." refer to the Affidavit in Support of Notice of Motion for Default Judgment submitted by Julie Cohen Lonstein, Esq., counsel for plaintiff, dated December 24, 2004; citations to "Viteritti Aff." refer to the Affidavit of John F. Viteritti, Jr., dated November 23, 2001, submitted as Exhibit A to Lonstein Aff.

(providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default").

After a default has been entered against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), a default judgment may be entered. See Fed. R. Civ. P. 55(b). If the amount of damages must be ascertained in order for default judgment to be entered, the court may conduct a hearing. See Fed. R. Civ. P. 55(b)(2); Enron Oil Corp. v. Diakuhara, 10 F.3d at 95. Here, plaintiff submitted a request for entry of default on November 10, 2004, and for default judgment on December 24, 2004. The clerk of court entered a default on February 25, 2005. The default judgment was entered on March 4, 2005. Thereafter, the motion for damages was referred to this Court.

2. Damages

Unlike allegations pertaining to liability, allegations in connection with damages are not deemed admitted in the context of a default judgment. The burden is on the plaintiff to establish its entitlement to recovery. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d at 158. Defendants who default are entitled to discovery regarding unliquidated damages. See U.S. v. Crichlow, No. 02 CV 6774, 2004 WL 1157406, at *4 (E.D.N.Y. April 9, 2004); Clague v. Bednarski, 105 F.R.D. 552 (E.D.N.Y. 1985). While "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not make the determination through a hearing." Fustok v. Conticommodity Servs., Inc., 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (citing Transportes Aeroes De Angola v. Jet Traders Inv. Corp., 624 F. Supp. 264, 266 (D.

4

Del. 1985)), aff'd, 873 F.2d 38 (2d Cir. 1989). Here, where the plaintiff has filed reasonably detailed affidavits and exhibits pertaining to the damages incurred and defendants have failed to make an appearance, or respond and present evidence on the issue of damages, the Court can make an informed recommendation regarding damages without an evidentiary hearing.

Where, as here, a violation of both Section 605 and Section 553 has been established, the Second Circuit has held that the court should award damages pursuant to Section 605. Int'l Cablevision, Inc. v. Sykes, 997 F.2d at 1007. Under Section 605, plaintiff is entitled to elect either statutory damages or actual damages. 47 U.S.C. § 605(e)(3)(C)(i). Here, plaintiff requests statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i)(II), and enhanced damages pursuant to 47 U.S.C. § 605(e)(3)(C)(ii). (Pl.'s Mem. at 2–8).

### A. Statutory Damages

Section 605 provides for penalties "for each violation of subsection (a) of this section ... in a sum of not less than $1,000 or more than $10,000, as the court considers just. ..." 47 U.S.C. § 605(e)(3)(C)(i)(II) (emphasis added). Although Section 605 requires the court to assess damages based on each "violation" of the statute, there is no statutory definition of "violation." See Garden City Boxing Club, Inc. v. Rosado, No. 05 CV 1037, 2005 WL 3018704, at *3 (E.D.N.Y. Oct. 6, 2005). Moreover, in cases such as this, involving the theft of services by a commercial establishment, it is often difficult to assess a precise figure. However, most cases applying this statute in a commercial context have interpreted the showing of an event on a single night as one violation. See, e.g., id.; Time Warner Cable v. Taco Rapido Rest., 998 F. Supp. 107, 111 (E.D.N.Y. 1997).

In determining the amount of damages that can be imposed for each violation within the range of $1,000 to $10,000 per violation, Section 605 leaves the decision within the sound discretion of the court. See 47 U.S.C. § 605(e)(3)(C)(i)(II); see also Home Box Office v. Champs of New Haven, Inc., 837 F. Supp. 480, 484 (D. Conn. 1993) (reducing an award from $250,000 to $10,000 for commercial broadcast of a boxing match); Time Warner Cable v. Taco Rapido Rest., 998 F. Supp. at 111 (citing cases). The factors to be considered in determining the appropriate amount of damages include the "'pecuniary loss sustained by the victim as a result of the offense, the financial resources of the defendant, . . . the financial needs and earning ability of the defendant . . . as well as the burden that a damage award would impose on the defendant relative to the burden alternative relief would impose.'" Cablevision Sys. Corp. v. De Palma, No. 87 CV 3528, 1989 WL 8165, at *6 (E.D.N.Y. Jan. 17, 1989) (quoting Cablevision Sys. Dev. Co. v. Cohen, No. 84 CV 1155, slip. op. at 4–5 (E.D.N.Y. May 20, 1988) (interpreting 47 U.S.C. § 553)); see also Entm't by J&J, Inc. v. Ramsarran, No. 01 CV 5223, 2002 WL 720480, at *2 (E.D.N.Y. Mar. 11, 2002).

In calculating lost profits, some courts have awarded a flat damage amount that they have "consider[ed] just" when dealing with the unauthorized receipt and broadcast of a cable program by a commercial establishment. See, e.g., Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp., No. 88 CV 2834, 1991 WL 58350, at *2 (E.D.N.Y. March 20, 1991) (awarding damages "based on the Court's view of the equities and not on the estimate of the number of patrons"); Home Box Office v. Gee-Co., Inc., 838 F. Supp. 436, 440 (E.D. Mo. 1993); Home Box Office v. Champs of New Haven, Inc., 837 F. Supp. at 484. Others have assessed damages based on the number of patrons in the commercial establishment during the broadcast. See, e.g., Garden City

Boxing Club, Inc. v. Rosado, 2005 WL 3018704, at *4 (awarding $54.95[3] per patron); Entm't by J&J, Inc. v. Mama Zee Rest., No. 01 CV 3945, 2002 WL 2022522, at *4 (E.D.N.Y. May 21, 2002) (awarding $50 per patron); New Contenders, Inc. v. Diaz Seafood Corp., No. 96 CV 4701, 1997 WL 538827, at *2 (S.D.N.Y. Sept. 2, 1997) (awarding $300 per patron); Time Warner Cable v. Taco Rapido Rest., 988 F. Supp. at 111 (awarding $50 per patron); Cablevision Sys. Corp. v. 45 Midland Enters., Inc., 858 F. Supp. 42, 45 (S.D.N.Y. 1994) (awarding $50 per patron). Plaintiff contends that the maximum amount of statutory damages ought to be awarded in this case. (Westrich Aff. ¶ 13).[4]

Plaintiff asserts that there are a number of components to the pecuniary loss suffered here, including lost sublicense fees, lost admission charges, and loss of good will. (Id. ¶¶ 4, 8). Here, plaintiff not only lost the sublicense fee that it would have been entitled to had the defendants entered into an authorized agreement to broadcast the Event, but given that there were at least two patrons present during the unauthorized broadcast, plaintiff also lost the admission fees normally charged by Kingvision from the individual patrons. (Pl.'s Mem. at 2).

Apart from the sublicense fee from the restaurant, plaintiff contends that defendants' patrons purchased meals and/or drinks while viewing the Event. (Id.) In addition, plaintiff argues that this theft of its services deprives plaintiff of its good will, reputation, and business investment and, as a result, has caused and continues to cause plaintiff to lose as customers those

---

[3]This amount was presumably derived from the fee that an individual would have paid to watch the match at home, and thus is a measure of the income that plaintiff lost by virtue of defendant's unauthorized broadcast. See Garden City Boxing Club, Inc. v. Santacruz, No. 05 CV 63, 2005 WL 2806251, at *3 n.1 (E.D.N.Y. Sept. 20, 2005).

[4]Citations to "Westrich Aff." refer to Plaintiff's Affidavit for Default filed by Donna K. Westrich, Vice-President of Plaintiff Kingvision Pay-Per-View, Ltd., dated November 24, 2004.

7

establishments who cannot attract paying patrons when the Event is televised in establishments that charge no fee or charge a fee that is considerably less than the fees demanded by plaintiff. (Westrich Aff. ¶ 12). Plaintiff also argues that this type of theft has an impact not only on the goodwill of plaintiff, but also on the satellite and cable industries in general. (Westrich Aff. ¶¶ 4, 11, 12). Accordingly, plaintiff argues that all of these factors should be considered by the court in fixing damages at the maximum statutory amount of $10,000.00. (Westrich Aff. ¶ 13).

B.  Enhanced Damages

Plaintiff also seeks enhanced damages pursuant to Section 605(e)(3)(C)(ii), providing for additional awards of up to a maximum of $100,000 for all violations. (Pl.'s Mem. at 3). The statute permits enhanced damages where the violation was committed willfully and for purposes of private financial gain. See Entm't by J&J, Inc. v. Mama Zee Rest., 2002 WL 2022522, at *4 (awarding $1,680 in statutory damages under § 605(e)(3)(C)(i)(II), plus an additional $10,000 in enhanced damages in order to both redress the harm and deter future violations, where an event was shown to thirty patrons in their restaurant); Cablevision Sys. Corp. v. Maxie's North Shore Deli Corp., 1991 WL 58350, at *2 (awarding statutory damages of $5,000 and enhanced damages of $25,000, where defendants showed the Tyson/Spinks championship fight in a large sports bar); Time Warner Cable v. Taco Rapido Rest., 988 F. Supp. at 111–12 (awarding enhanced damages of $5,000, where court found that defendant's unauthorized showing of the event likely led to "an increased number of patrons and thus to an increase in profits," but that defendant did not "charge a cover fee or show the Event on multiple televisions").

Willful behavior under this statute has been interpreted to include "'disregard for the

governing statute and an indifference to its requirements.'" ON/TV of Chicago v. Julien, 763 F.2d 839, 844 (7th Cir. 1985) (quoting TransWorld Airlines, Inc. v. Thurston, 469 U.S. 111, 127 (1985) (defining willfulness in the context of a different civil statute)). Here, it is clear that defendants intercepted and broadcast the Event without entering into a licensing agreement with plaintiff or paying fees to plaintiff. To do so, defendants must have utilized an unauthorized decoder, illegally transferred an authorized decoder to the location, or illegally altered cable service to bring the signal to the restaurant. (Westrich Aff. ¶ 9). The defendants then broadcast the Event to patrons who were not required to pay the admittance fee customarily charged by plaintiff under its sublicense agreement, but who purchased meals or drinks from defendants while viewing the Event. Thus, the evidence indicates that defendants acted willfully in illegally intercepting the Event, and that they did so for private financial gain.

C.  Application

If statutory damages were assessed at the rate of $50 per patron as some courts have done, this would result in an award of only $100 in lost revenue, based on the 2 patrons present at the Event. This award is far less than other awards made under similar circumstances in the Eastern District. See, e.g., Garden City Boxing Club, Inc. v. Rosado, 2005 WL 3018704, at *4 (awarding $989.10 in statutory damages, based on $54.95 per patron); Entm't by J&J, Inc. v. Mama Zee Rest., 2002 WL 2022522, at *4 (awarding $1,500, based on $50 per patron); Time Warner Cable v. Taco Rapido Rest., 988 F. Supp. at 111 (awarding $3,750, based on $50 per patron). This award is also far less than the types of damages often imposed against individuals who have received unauthorized programming in their own homes. See, e.g., Time Warner Cable v.

9

Barnes, 13 F. Supp. 2d 543, 548 (S.D.N.Y. 1998) (awarding $1,000 against each of two defaulting residential defendants); Time Warner Cable v. Rivera, No. 94 CV 2339, 1995 WL 362429, at *3 (E.D.N.Y. June 8, 1995) (awarding statutory damages of $1,500 against defaulting residential defendant who used converter for eight months).

This Court finds that this amount understates the seriousness and willfulness of defendants' conduct here, particularly since, as plaintiff contends, it has suffered intangible losses in the form of "business investment, business opportunities . . . and goodwill." Am. Tele. & Comm. Corp. v. Floken, Ltd., 629 F. Supp. 1462, 1466 (M.D. Fla. 1986). In Cablevision Systems v. Faschitti, the court stated:

> it is likely that [defendant's] interception cost Cablevision more than simply the fees it would have received if those in the tavern had purchased right to view the fight legitimately. Many non-subscribers may feel no need to subscribe to Cablevision when they can access programming such as pay-per-view at commercial establishments.

38 U.S.P.Q.2d 1156, 1158 (S.D.N.Y. 1996). In addition, legitimate commercial establishments may be unwilling and unable to compete financially with establishments such as defendants' who offer the stolen programming to their customers for no fee or a reduced fee. Defendants' acts similarly damage plaintiff's goodwill and ability to control and negotiate for the rights to transmit the Event.

Given all of these factors and the fact that the evidence demonstrates that defendants acted willfully in illegally intercepting the Event under circumstances that warrant imposition of enhanced damages under Section 605(e)(3)(C)(ii), it is respectfully recommended that plaintiff be awarded statutory damages of $2,000, plus an additional $5,000 in enhanced damages, for a

10

total of $7,000, for which defendants are jointly and severally liable.

3. Costs

Pursuant to Section 605(e)(3)(B)(iii), plaintiff is also entitled to an award of costs. See 47 U.S.C. § 605(e)(3)(B)(iii). Plaintiff's counsel seeks $560 in costs from the defendants.[5] (Pl's. Mem. of Law at 18). In support of that request, plaintiff has submitted an affidavit from Donna K. Westrich, attesting to the payment of $275 to the auditor for his investigation services.[6] (Weinstein Aff. ¶ 6). In addition, plaintiff seeks reimbursement for filing fees of $75 and service of process fees in the amount of $45 from Jimenez and $90 from El Paisa. (Lonstein Aff. ¶ 31). Based on the supporting affidavits, this Court finds the amount requested for costs to be reasonable and respectfully recommends that plaintiff be awarded $220.00 in costs from defendant Jimenez and $265.00 from El Paisa. (See id.).

3. Interest

Plaintiff requests interest on their award. (Pl.'s Mem. at 3; Compl. at 7). Section 605 is

---

[5] Although the statute also provide for an award of attorneys' fees, plaintiff's counsel has not requested fees nor submitted supporting documentation in this application.

[6] Courts have authorized awards of investigative costs as appropriate under the statute. See, e.g., Int'l Cablevision, Inc. v. Noel, 982 F. Supp. 904, 917 (W.D.N.Y. 1997) (citing the legislative history of Section 605(e)).

11

silent as to the amount of a pre-judgment interest rate. In such cases, the "'common practice' among courts within the Second Circuit is to grant interest at the rate of prejudgment interest under New York State law." Serv. Employees Int'l. Union, Local 32BJ v. Stone Park Assoc., LLC, 326 F. Supp. 2d 550 (S.D.N.Y. 2004). Under New York State law, prejudgment interest here accrues at the rate of nine percent from the date of the violation until the entry of judgment. N.Y. C.P.L.R § 5004 (McKinney 1992); see also Garden City Boxing Club, Inc. v. Morales, No. 05 CV 0064, 2005 WL 2476264, at *2 (E.D.N.Y. Oct 07, 2005).

Under New York State law, the judgment also accrues interest from the date that the entry is docketed until the judgment is paid. N.Y. C.P.L.R § 5003 (McKinney 1992); see also Banda v. Haro, No. 01 CV 5552, 2001 WL 1702205, at *3 (S.D.N.Y. Jan. 10, 2001). Thus, post-judgment interest accrues at the rate of nine percent per year. N.Y. C.P.L.R. § 5004; Banda v. Haro, 2001 WL 1702205, at *3.

It is respectfully recommended that plaintiff be awarded pre- and post-judgment interest at the rate of nine percent per annum, running from November 17, 2001, the date of the violation, until the date the judgment is paid.

## CONCLUSION

Accordingly, this Court respectfully recommends that plaintiff be awarded $7,000.00 in damages for which defendants are jointly and severally liable, plus costs in the amount of $220.00 in costs from defendant Jimenez and $265.00 from El Paisa, plus interest from the date of the violation until the date the judgment is paid.

Any objections to this Report and Recommendation must be filed with the Clerk of the

Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**

Dated: Brooklyn, New York
February 24, 2006

/s/ Cheryl Pollak
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York